May it please the Court, Cheryl Gordon-McLeod on behalf of Mr. Johal, and I am joined at counsel table by my colleague Al Bentley, counsel for NACDL, who authored their legacy on the mens rea issue. I submitted a supplemental authority letter last week containing, among other cases, the United States v. Cower case, and I thought I'd begin briefly by addressing the effect of Cower on the mens rea argument, and then, for obvious reasons, turn and spend the bulk of my time on the other arguments in the brief. Cower, as this Court is probably aware, decided virtually the identical mens rea issue on the same statute with jury instructions that, while not identical, were quite similar to jury instructions in this case. I maintain that it was wrongly decided, and that the Cower decision in particular conflicts with the decisions on page 32 and 33 of our opening brief concerning reasonable cause to believe being an objective rather than subjective standard. But I understand that, if necessary, that's an argument that I would make to an en banc panel rather than to this panel. I do, however, believe that the additional arguments that we made in the opening brief are dispositive. In particular, the argument about the element, quote, will be used to manufacture a controlled substance. 841c2, under which Mr. Joe Hall was convicted, provides that the government must prove that he knew or had reasonable cause to believe that the precursor chemical that he sold will be used to manufacture a controlled substance. In this case, the evidence was undisputed that the precursor chemical will not be used to manufacture a controlled substance. The two distribution counts, Counts 1 and 2, were stings. There were sales to agents. There was testimony at the trial in response to the defense counsel's questions specifically stating that the precursor chemical would never be used to manufacture methamphetamine or any other controlled substance because they were intercepted by the CBA agent. Your position that even if the person who is on trial believes to a certainty in their heart of hearts that it's going to be used for that purpose, they're still not guilty if it, in fact, isn't? That is my position, Your Honor. And I base that on the Crass case and the Plyman cases, which I think analyzed statutes that were indistinguishable in structure from this statute, in that they criminalized whoever knowingly or with reasonable cause to believe committed a certain transaction, in those cases selling a firearm to a nonresident of the State. And although the seller in his heart of hearts, as you said, believed that the ATF agent who was posing as the buyer was an out-of-State resident, because that's what the ATF was saying to him, nevertheless, the ATF agent was an in-State resident, and in both of those cases, each of those circuits conclusively held that the reference to the status of the buyer, the reference to whether he was an out-of-State resident, referred solely to the status of the buyer. And did not refer to what the seller had in his mind. And if you compare the structure of our statute, 841C2, with the structure of the statute that was at issue in both of those cases, 922A5, they're virtually identical. Ours begins, any person who knowingly or intentionally possesses or distributes a listed chemical, knowing or having reasonable cause to believe, and then it gives the phrase I'm talking about here. Well, the reason I have some difficulty with that is that subsection 1 makes it an offense to knowingly or intentionally possess the same chemical with the intent to manufacture it, if it's an unauthorized manufacturer. So that happens at the time of possession. You possess with the intent to manufacture, whether you ever manufacture or not. And subsection 2 seems to say Well, if you're not going to intend to manufacture it yourself, but essentially you intend for someone else to, we're going to pull that conduct in, too. So I guess contextually I see it somewhat differently than you do. Well, possess with intent to manufacture both refer to the defendant. Both refer to the buyer on trial. Exactly. But what I'm suggesting is that both subsections 1 and 2 make the crime complete upon possession with a certain state of mind. And neither, and certainly number 1 does not require actual manufacture. And I don't understand why Congress would have required subsection 2 to require actual manufacture. Well, I think the question you're posing is the issue, does it make the crime complete upon the existence of a certain state of mind? And what we look to is the plain language of the statute. When you look at section C2, it says reasonable cause to believe that the listed chemical will be used to manufacture a controlled substance. Now, it doesn't say why. But if you have a reasonable cause to believe it, it doesn't make it true. You have reasonable cause to believe it's true, but it doesn't have to actually be true. Well, let's look at the other side of it. What if he was prosecuted solely under the knowledge prong and the government was able to, you know, submit a jury instructions and we knew that he was convicted only under the knowledge prong? At that point, it would read, knowing that the listed chemical will be used to manufacture a controlled substance. And in that situation, I think it's pretty darn clear that it would have to be. So I say to you, I'm going to use this to manufacture X. And you say, terrific. I'm going to give it to you, knowing that that's what you're going to do. And then I drop down a large step. Okay. Have you committed a crime or not? Well, it's similar to the mistake of fact jurisprudence. Under the Kras and the language is at best ambiguous about whether it's referring to my, the seller's state of mind, or whether it's referring to the buyer's actual status. And in that situation, Kras chose ambiguity is construed against the government. But there it was plainly requiring a status on, very plainly requiring a status on the part of the buyer. Well, I'm glad you see it that way. But this statute is written very differently. And it seems to me that you're trying to make 1 and 2, subsections 1 and 2, mean much more different things than it appears to me that they were intended to mean. Well, I understand your point about reading subsections 1 and 2 together. And I will acknowledge that that's a plausible interpretation. My argument is that there's an equally plausible interpretation when you hold section C2 of 841 up next to 922 A5. Their structures are the same. 922 A5 makes it unlawful to sell any firearm to any person who the transferor knows or has reasonable cause to believe does not reside in the State. Same structure. Knows or has reasonable cause to believe, and then refers to the status of the buyer, does not reside in the State. Our statute knows or has reasonable cause to believe and then refers to the status to the will be used to manufacture a controlled substance. I believe that my reading is equally plausible, that if it refers solely to the status of the buyer in 922 A5, it refers solely to the status of the buyer in 841 C2. Is the jurisprudence of the Seventh Circuit entirely consistent on this? Is it entirely consistent? Is the Crest case in line with the general law in this area? The only cases that I was able to find were the two that I put in the brief, Crest and Flyman. One of them cites to an adverse authority. I'm not remembering it. It may have been a district court authority. I was not able to find any other 922 A5 cases on this issue. The government found five cases which they said were 841 C2 cases adverse to me, and I'd like to address those. First of all, my read is that none of them were sting operations, and that's what distinguishes my case. Mine is a case where somebody was posing that they were going to make it into meth later, and none of those other cases were. Further, it wasn't the issue that was discussed in most of those cases. In Pranther, which I think the government places the most reliance on, the Court held only that the government need not prove that the precursor chemical was already made into methamphetamine. Will be requires, they said, a present intent to violate the law in the future, but not a showing that it had already been made into methamphetamine. Well, that's not our case, and Pranther was saying that. I'm sorry. I don't follow the distinction you're trying to draw. In Pranther, they said it was enough that he had reasonable cause to believe that it would be, and that no manufacture of methamphetamine was required. I don't understand what distinction you're trying to draw between the two. Well, the two distinctions I'm trying to draw between Pranther and our case are, first, our case was a sting operation, and Pranther was not. Which has what legal significance? Well, there was no reasonable cause to believe. The operative fact did not exist in our case, and the operative fact did exist in Pranther. The operative fact being the buyer's present intent to manufacture the precursor into an illegal drug. If it's not a sting operation, if it's a real meth cook coming in to buy it, then you've got the operative fact. You've got the buyer with the present intent to manufacture it into a precursor. So you're saying you have not only the defendant's own intention, but you have to have some third party's intention, and the government then has to prove the intention of two parties, not just the defendant who's before the court? Well, I'm arguing that will be used to manufacture a controlled substance has some meaning, that it does not refer solely to the intent of the transferor, and that it necessarily refers to something else, meaning the status of the buyer. I suppose it could also refer to government proof that it will be met, that there was actual manufacture thereafter, but I think that's a little strained, and that's not supported by the Kras and Plyman cases. I think what's supported most directly by those cases is to look at the present status of the buyer. Okay. You might want to move on to some of the other issues. Well, of the five cases that the government cites, none were stings. The other dispositive issue is on count two, the jury unanimity issue. Count two was the count referring to March 13th of 2002, on which there was evidence presented of two separate discrete sales, the one sale to the Hengeman Green group and the other sale to Dan Wooten, the informant. We have evidence of two separate sales, two separate intents to buy, two separate seizures of pills. The jury instructions on count two do not distinguish between those two separate incidents, therefore allowing a conviction if some jurors believe that one occurred and some jurors believe that the other occurred. A particular problem, given my argument about reasonable cause to believe, because one of those was a sting operation and one of those was not a sting operation, and the government acknowledges that the jury instructions did not require unanimity as to which incident the jurors agreed upon, but argues essentially that it doesn't matter. I think the answer to that is that under United States v. Garcia Rivera, it does matter. There's a right to jury unanimity on the acts constituting the crime. Jury instructions allowing conviction of a firearm in that case at three possible separate times violated that principle and necessitated reversal. We have essentially the same error here. There was no polling of the jury. There was no special interrogatory given to the jury, simply a general verdict of guilty where it is undisputed that the government submitted evidence of two separate and discrete sales on the exact same date. Was there a request for an instruction? Your Honor, there was not a request for an instruction, and as the government points out, that means that we're reviewing it under the plain error standard. But, of course, that's exactly what occurred in Garcia Rivera. There was a dispute about the standard of review that should be applied there, and the Court concluded, well, we need not decide what standard of review applies because the defendant wins even under the plain error standard because the error is so egregious. So, yes, plain error standard, but just as it was in Garcia Rivera. The government's ---- Well, Garcia Rivera involved a ---- there was an instruction that was wrong. There was an instruction of sorts that received some criticism. The interesting thing about that instruction is that it overlapped. It gave overlapping dates, either convicted if it was between May 19th and June 7th or one week after the purchase of the gun or on June 7th itself. So there was overlap in that case, and one might ---- the government might have even argued that they might have referred to the same time. And I raise that because the government's essential answer to our argument is, well, they were both on the same night, so they were both so close in time. And I think the answer to that is, of the three choices in Garcia Rivera, they weren't really separate. They were pretty much overlapping. Nevertheless, there was still the same danger that some jurors might have believed that one incident occurred and some jurors might have believed that the other incident occurred. There was a unanimity instruction in this case, wasn't there? Instruction 31. General unanimity. You know, I hear your question, Your Honor. I don't know. I'll try to answer you when I stand up and reply. I don't recall if there was a general unanimity instruction. Well, if there was, and so the jury got the instruction 7 on count 2, which refers to a need to find a transaction. Does not a general unanimity instruction tell them that essentially they have to agree unanimously on what the offense is, and therefore it's just a matter of common sense? They're not going to sit there and say, well, half of us think he did one and half of us think he did the other? Well, that may be the case if the elements instruction essentially allowed them to point, for some reason, if there were different dates or if there was something else confusing about the elements instruction. But in this case, the elements instruction pointed to a single date, not to a time and not to a particular incident by name or in any other respect. So where the instructions are potentially conflicting on that, the elements instruction being the key instruction that they look at, allowing the conviction and the unanimity instruction arguably disallowing it, I think there's still a problem. Well, I guess my point is on the elements, they had to find that there was a distribution. That's what the elements said. It doesn't, as you say, it doesn't break it down as to which of the two instructions by two translated. Incidents, correct. It did not break it down. So the unanimity general instruction you don't think would be sufficient to get them to say one of the two, can we agree unanimously on one of the two? I think that's difficult to ask the jurors to do when the two incidents were so close in time. The testimony was that as they were waiting to send the informant Wooten in, they saw Green and Hengem coming out carrying the bag. So where there's potential for overlap like that, I think the general unanimity instruction would not suffice. My final argument was on the acceptance of responsibility. I think with the supplemental authority I submitted on, I think it was Rojas Flores or Flores Rojas, that I will simply rest with that case and save any time I have for rebuttal. All right. Thank you. Good morning, Your Honors. May it please the Court, Russ Smith for the United States. As the Court is well aware and has been fully briefed on this case by both counsel as well as an amicus brief, and the Court has now been aware of the recent Ninth Circuit decision of United States v. Cowher concerning pretty much what I would have termed prior to Cowher as really the seminal issue in the case. It leaves us with three other issues raised by the defendant. I do have some rebuttal for what has been presented by defense counsel, but I can field questions if the Court will. I have a question. I'm concerned, speaking, of course, only for myself, but I'm concerned about the unanimity issue on count two. There were two distinct transactions, one with Lewton and one with Henshaw, and they were unrelated transactions. And it happens they both occurred on the same day. But it would appear from our prior cases that the jury had to be unanimous as to which one of those two, not just on the date, but on which of the transactions had occurred. And I wonder why there isn't a problem with giving them the date but not when there are such distinct transactions on that date. Well, Your Honor, I guess I would respond first that under the standard of review in this case, being a plain error standard, we look in terms of whether there is an error, whether or not it was plain. The jury was instructed with a general unanimity instruction. Which instruction number was that? 31, I believe. I just looked it up. I can look it up again. I believe it was instruction 31. The jury was also instructed to weigh conduct uncharged towards knowledge or intent, but not towards – it was basically instructed on what would have been presented as 404B evidence or evidence that's inextricably intertwined in the case.  But evidence was also presented on a sale that was done on December 10, 2001. There was also testimonial evidence that I guess inextricably intertwined in this case concerning the – I don't understand how that's relevant to the question whether they were unanimous in deciding which event occurred on March 13. Your Honor, first, I don't know that it was necessary. There were two sales on March 13. One of them, as indicated by counsel, was a sting sale. The other was a sale that happened not at some other time, but simultaneous at exactly the same time that the DEA operation was happening, another sale was being made. It was the same date. It wasn't confusing. Ultimately, the jury instruction on that was not as confusing as it was in Garcia, where the real difficulty was not just a number of different dates or possible dates, but what was raised in Garcia was that one of the alternate dates that the jury could have concluded that the defendant possessed a firearm would have, according to the argument in the case, would have been based solely upon the defendant's statements that he fired the gun approximately a week after he got it. Now, in this case, there was ample evidence. First, the case law indicates that if a case is not – first, it indicates that if a case is presented straightforward, then it doesn't raise the same issue. Let me give you a hypothetical and see if we can work through it and maybe see if my concerns are misplaced or not. Let's assume that this was a bank robbery case, and the person robbed the first national bank in the morning and the second national bank in the afternoon, both on March 13. And the jury is duly instructed that about all the elements of bank robbery, do they have to agree which bank he robbed? Well, yes, I think that that would be an actual distinction. Okay. And if they have to agree on which bank he robbed, is it sufficient to have a general, he had to have robbed a bank on March 13, and by the way, you have to be unanimous. Would that be sufficient in my bank robbery case? No. Then why is this sufficient? Because if I use the bank robbery analogy, let's say that the defendant is charged with robbing the first national bank on March 13, but yet he robs bank funds on March 13 from, say, Teller A, and he also robs funds from Teller B at the same time. Now, this is somewhat analogous, but the single count or the single act of robbing that bank on March 13 would be sufficient. Now, in this case, the defendant didn't go to two separate places or at different times. At the exact same time, from the exact same place, from the exact same counter, he committed the offense of distribution of a listed chemical, in this case, pseudo-Fedrin. It was not a matter of, it could be seen, although it can be divided into being a discrete event, and it was charged as concerning the sting operation, if the Court will. It was still simultaneous conduct, and it was the exact same conduct without the type of distinction. So you're saying it's an indivisible event, basically. Yes. And furthermore... So it would have been okay under that theory to treat the, whatever activities he engaged in from that counter, in the selling of the pills, if he'd had five customers, and the government was one of the stings, and then the other four, one was, you weren't sure, but it was possibly legitimate, and the other three were people he'd been supplying. That goes to the jury. The jury could decide, non-unanimously, on which, some might favor one over the other, but the total conclusion is that his activities during the day, unanimously, for each picking a different, many picking different transactions, that he had, in fact, knowingly distributed the drug. That's sufficient. Even if they didn't all agree on which of the five transactions was the violation. I think the reason, yes, with an explanation, Your Honor. The reason for that is not because the defendant ever disputed the act of distribution of pseudoephedrine. He didn't dispute it. He acknowledged that, in fact, that was, as defense counsel points out, and the government agrees, that was the heart of his defense, that he didn't dispute the distribution or the possession of pseudoephedrine. What the defendant hung his defense on was his own state of mind. So, first, Your Honor, the government would present, would suggest that the jury was able to differentiate and determine discrete counts as charged and discrete incidents. However, due to the way that the case was presented, due to the defendant's defense, and the very charge itself, it's not a charge of distributing, for example, controlled substances, distributing a certain statutory penalty amount at one point and a lesser penalty amount at another point. Which one does the jury decide? I don't know if I was very clear on that, but what this is, this particular case did not hinge as charged on a particular amount. The reason how it turned into amount, and, of course, this leads into recent developments in the law, that the defendant did make admissions to distributing the pseudoephedrine. So what was basically at stake was not a factual dispute of whether or not he did the act or any act on the 13th, but it was his state of mind in doing so on the 13th. And there was no special defense with respect to one of these transactions as opposed to the other? No, Your Honor. And I think it could also be seen in other terms. The events occurring on March 7th included a DEA sting operation, but there were a total of seven discrete purchases all over the same time period, and I guess one that occurred later in the day with the same people. However, in this case, a number of them occurred with the confidential source. Another one occurred, and some of them occurred with the confidential source and the undercover agent at the same time. So the same argument would be ineffective in that case, that it was a continuous course of events over that day, March 7th, that the defendant distributed pseudoephedrine, and it was, again, he admitted the distribution. It was simply the state of mind that was challenged. I would just briefly, the other issue that was raised in argument, Your Honor, was the issue of whether or not the amphetamine needed, basically needs to be made during the, in order for criminal liability to attach. The government would submit that that is, again, briefed and it's briefed, but the criminal liability in this case attaches when the defendant commits the criminal act for which he's charged, which is the distribution or possession of the listed chemical, in this case, pseudoephedrine, with the state of mind, or more appropriately, sub-state of mind of knowing or having reasonable cause to believe of what would happen to it, that it would be manufactured into a controlled substance. Now, to require the subsequent act to occur in order for the government's brief to observe results, all the DEA would have needed to do after a controlled sting operation would be to go to the laboratory and produce methamphetamine and then present that evidence. It's a needless step because criminal liability is already attached. Furthermore, given the case of, hypothetically, that someone is observed or has happened in this case, observed purchasing pseudoephedrine from the convenience store, DEA is aware of that. In order for DEA, even if there was complete knowledge that they had absolute 100% confirmation that the store owner had said, yes, go make methamphetamine with this, DEA would have to sit back and allow the purchaser to engage in the methamphetamine process in order to wait for it to mature. No, they say that in that case, they don't have to because the purchaser had a present intent to do it. They're distinguishing the sting case, at least, which is to say that there's no intent. The state of mind of the purchaser is not to use this as a fake. The other person has a present intent to do it. It may be thwarted by all sorts of things, including getting arrested. But that's not the case. So that's the will-be-manufactured issue. I would submit, Your Honor, that that's why criminal liability attaches to the state of mind of the defendant. But it didn't in the gun case, so what's the difference? Well, I would submit that that is, indeed, a Seventh Circuit case. Well, the wildcat Seventh Circuit. That does come into account that a number of these issues are issues of first impression in this case as well. And we are looking to other circuits that seem to be more favorable to us. I do. The amicus brief and counsel for the defendant himself urge that this is a particularly awkward area because Congress has sought to criminalize the behavior of over-the-counter retail clerks rather than the people who are really out there engaged in the illegal conduct. They're sort of going for the agents rather than for the facilitators, if you will. And it's a little troublesome to say that someone who's a clerk in a 7-Eleven or whatever can be sent to jail because somebody can come along after the fact and say, gee, you should have known that anybody who's buying and then pick a number in excess of three or three bottles or whatever was going to use this for meth. I had no idea before I came on this Court that you use these things for that. And I even learned some more stuff in this case. So what is the way to rein in that risk? The defendant's arguing, and the amicus is arguing, you have to make it akin to actual knowledge, the Tenth Circuit kind of approach. But should there be a very high standard for the level of proof if there is both actual and reason to believe a very high standard of evidence as to what the second prong, the alternative prong, short of actual knowledge should be? And if so, how would one articulate that? Because all that Cower was dealing with was the jury instruction. It didn't get to whether the statute itself was imposing an untoward liability. So I still think there's some room to tweak Cower, perhaps. That's my view anyway. Well, Your Honor, I guess from the government's perspective, I can't imagine a more higher standard than reasonable doubt. We do kind of step into the realm of a back, I guess, pre-Cower, Your Honor, concerning the constitutionality of the statute. And it really goes into the argument is why is this statute different than 841A1? At first, it's different because 841A1 deals with controlled substances. It deals with, you know, the practical effect of that as generally cocaine, methamphetamine, whatever else. Here we have a situation where we're dealing with what's been defined as a listed chemical. Yes, but it's very troublesome because everyone in the courtroom has bought this particular product  But she's the only cook on the panel. So, this is not that you don't even need a prescription to buy this. Is there any analogy in any other drug like this that's treated as a substance that's not really controlled? Well, I don't know that there's necessarily a good analogy in that a listed chemical not only includes pseudoephedrine but other potential medications that could be used in a certain way. I think that really the distinction is in the language of the statute. The problem with our circuit as well as any other circuit that has to address this statute is that there's not a lot of legislative history that says we wanted this language because. But, if you analyze the language in terms of why is it different than the controlled substance statute you come to this term that how is the distribution or the possession done? Well, it's done because of this modifier or this condition of the state of mind with knowledge or with reasonable cause to believe that it will be used towards this illegal purpose. In our case of making methamphetamine but that way, that's the beginning separation of the legal sale of pseudoephedrine, pseudoephed, whatever brand name it might be or that type of product, and an illegal sale. Now, there is no amount in federal law. The amount is maybe three boxes in certain states and that may vary. But in federal law, there's no amount. It is specifically related to the state of mind of the distributor or the possessor. So, how do you show that? You show that by the evidence that transpires around the sales. In this case, I see that my time is running out. This case is very much like the 8th Circuit case of BWIG where a convenience store operator received large quantities, had nominal three box limits but broke those limits, sold in case amounts. This particular case the defendant was extremely nervous about going to jail, was nervous about the police and had, appeared to have some warning that these products were used to manufacture methamphetamine. Therefore, this is the type of evidence that's presented to a jury. Speaking from my experience in these cases, that's fine. Thank you. Your Honor, to try to better answer your question about the jury instructions, the unanimity instruction that was given was contained in number 31, which is in the ER at 96. All it says is you will take this form, the verdict form, to the jury room and when you have reached unanimous agreement as to each verdict, you will have your presiding juror fill in, date and sign the verdict form to state the verdict upon which you unanimously agree. So it's not a unanimity instruction that says you need to be in agreement on the acts constituting the crime. And then if you go back to the elements instruction ER 72, it says first that on March 13, 2002 the defendant knowingly did this distribution. What's your response to the argument that in this case it unfolded as an indivisible thing because the fact of possession and distribution was not an issue, only the state of mind was an issue which it was an indivisible state of mind? Well, if I'm understanding your question, it's the unit of prosecution issue that I believe the government was bringing up in response to the jury unanimity argument, that it was unfolding as a series of different sales over the course of an evening. Let me suggest that the unit of prosecution in these types of cases is single intent, single buyer, single transferor even if they come in five minutes apart to get their three bottles and then another three bottles. Our problem with count two is that there were different intents with the Hengem green sale as opposed to the Wooten sale with different transferors, different bottles it was a completely different transaction. If that's so, then I had a little trouble asking why there wasn't a request for an instruction. It's a completely valid question. The answer is it's a plain error standard of review but that's what they were stuck with in Garcia Rivera also. If there's no further questions I'll give up the remaining ten seconds. Thank you. The argument was very helpful and very good on both sides. Thank you. Thank you. The case just argued is submitted. We do appreciate the quality of the argument presented. We'll hear the next case which is United States v. DeWalt. May it please the Court. David.
judges: Schroeder, Graber, Fisher